**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| JANET GONZALEZ, LISA WILKINSON, | § | |
| MAURA CERRANO, and PAULA DIAZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 8:10-cv-02188-AW |
| | § | |
| BELINDA CARON and JAMES CARON, | § | |
| | § | |
| Defendants. | § | |

_____

**<u>FIRST AMENDED COMPLAINT</u>**

**I.    Preliminary Statement**

1.1    Plaintiffs are four women who were employed as housekeepers for the Defendants at

their home in rural Montgomery County.  Each Plaintiff was promised $350.00 per week to work

Monday through Friday.  The Carons failed to pay each Plaintiff for all of the work they

performed, made excuses about why they could not pay and made repeated promises to pay

Plaintiffs 'next week.'  The Plaintiffs suffered varying degrees of additional mistreatment.

1.2    The Carons promised Janet Gonzalez that they would take her to and from the metro at

the beginning and end of each week.  They refused to do that and restricted her access to

telephones and computers.  Ms. Gonzalez learned about and called a human trafficking hotline

that referred her to CASA of Maryland.  Thereafter, a group of workers from CASA of Maryland

helped her leave the house and return to Washington, D.C.   Ms. Gonzalez worked seven days

per week for more than four months between September 2009 and January 2010 and was paid

nothing.

1.3     Plaintiff Lisa Wilkinson worked for the Carons for approximately six months between April and October of 2008.  For her first month of work she was paid $100.00.  Thereafter she was paid occasionally and in varying amounts that were typically less than $350.00 per week.

1.4     Plaintiff Paula Diaz worked for the Carons for approximately two-and-a-half months between October 2008 and January 2009.  She was not paid for her last two weeks of work.

1.5     Plaintiff Maura Cerrano worked for the Carons for approximately three months between May and August of 2009.  Ms. Cerrano worked most weekends.  During these three months she was paid approximately $700.00.

1.6     The action is based on Defendants' violations of Plaintiffs' rights under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et. seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. § 3-401, *et seq.*, the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, *et seq.*, the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1590, 1595, Montgomery County Code, Chapter 11, § 11-4B, and on Defendants' breach of contract, fraudulent misrepresentation, negligent misrepresentation and negligence.  Plaintiffs seek damages and declaratory relief.

## II.     Jurisdiction and Venue

2.1     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (conferring jurisdiction over claims arising under laws of the United States) and 28 U.S.C. § 1337 (conferring jurisdiction over claims arising under the Acts of Congress regulating commerce).

2.2     The federal claims in this action are authorized and instituted pursuant to 29 U.S.C. § 216(b) (FLSA), and 18 U.S.C. § 1595(a) (TVPA).

2.3     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b).

2.4    This Court has supplemental jurisdiction over the state law claims, under 28 U.S.C. § 1367, because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III, Section 2 of the U.S. Constitution.

2.5    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

### III.    The Parties

3.1    Plaintiff Janet Gonzalez ("Ms. Gonzalez") is a resident of Washington, D.C.

3.2    Ms. Gonzalez is a native Spanish speaker. She understands some simple English, but cannot communicate well in English and generally speaks only Spanish.

3.3    Plaintiff Lisa Wilkinson ("Ms. Wilkinson") is a resident of Laurel, Prince George's County, Maryland.

3.4    Plaintiff Paula Diaz ("Ms. Diaz") is a resident of Germantown, Montgomery County, Maryland.

3.5    Ms. Diaz is a native Spanish speaker. She understands and speaks some simple English, but cannot communicate well in English and generally speaks only Spanish.

3.6    Plaintiff Maura Cerrano ("Ms. Cerrano") is a resident of Washington, D.C.

3.7    Ms. Cerrano is a native Spanish speaker. She understands and speaks virtually no English.

3.8    Plaintiffs were "domestic workers" under Montgomery County Code Sec. 11-4B(b).

3.9    Defendant Belinda Caron is a resident of Montgomery County, Maryland. She may be served with process at her residence and home-office located at 21414 Peach Tree Rd., Dickerson, MD 20842.  She is the wife of Defendant James Caron and the mother of Brittany Caron.

3.10     Defendant James Caron is a resident of Montgomery County, Maryland. He may be served with process at his residence located at 21414 Peach Tree Rd., Dickerson, MD 20842.  He is the husband of Defendant Belinda Caron and the father of Brittany Caron.

3.11     Defendants engaged in interstate commerce within the meaning of the FLSA.

3.12     Defendants employed Plaintiffs within the meaning of the FLSA, the MWHL, and the MWPCL.

3.13     Defendants were employers of Plaintiffs under Montgomery County Code Sec. 11-4B(b).

**IV.     Statement of Facts**

      **a.     Facts Relevant to Plaintiff Janet Gonzalez**

4.1     Defendants placed an advertisement on the internet classified advertisement site, Craigslist, seeking a Spanish-speaking housekeeper.

4.2     The advertisement offered pay of $350.00 per week for washing and ironing.

4.3     On September 19, 2009, Plaintiff Janet Gonzalez responded to the ad by e-mail and indicated that she was interested in the job.

4.4     Defendant Belinda Caron replied by e-mail and she and Ms. Gonzalez arranged to speak on the telephone.

4.5     Ms. Gonzalez called Defendant Belinda Caron on September 19, 2009.  Defendant Belinda Caron told Ms. Gonzalez that she wanted a Spanish-speaker to be a Monday to Friday live-in housekeeper to wash and iron her work clothes.

4.6     On the phone, Defendant Belinda Caron told Ms. Gonzalez the pay would be $350.00 per week with experience.

4.7     On the phone, Defendant Belinda Caron told Ms. Gonzalez that Ms. Gonzalez did not need a driver's license because Caron's daughter, Brittany Caron, could drive her.

4.8     On the phone, Defendant Belinda Caron arranged with Ms. Gonzalez to meet for an interview at the Shady Grove Metro stop at 2:00 p.m. the following day, September 20, 2009.

4.9     On September 20, 2009, Ms. Gonzalez traveled by Metro to Shady Grove and met Defendants and their daughters in the station parking lot.  The Defendants interviewed Ms. Gonzalez in their vehicle.  The Defendants used their daughter, Brittany Caron, as a translator and they also often did so thereafter.

4.10    Defendants told Ms. Gonzalez that they would pay her $350.00 per week, with experience, to do washing and ironing as a Monday to Friday live-in housekeeper.

4.11    Defendants asked Ms. Gonzalez if she had experience cooking.

4.12    Ms. Gonzalez told Defendants that she had experience as a housekeeper and as a cook.

4.13    Defendants told Ms. Gonzalez that generally she would be paid at the end of each month, but that her first pay would come after two weeks of work.

4.14    Defendants told Ms. Gonzalez that she would transport her to and from the Metro station at the beginning and end of each work week.

4.15    Defendants offered and Ms. Gonzalez accepted the employment on the terms outlined above.

4.16    Defendants and Ms. Gonzalez entered into a contract on those terms.

4.17    Ms. Gonzalez was at all times ready to comply with the terms of the contract and did in fact comply with the terms.

4.18    Ms. Gonzalez relied on the Craigslist advertisement, the statements of Defendant Belinda Caron on the telephone, and the statements of Defendants during the in-person interview in accepting the job and in performing work for Defendants.

4.19    Defendants did not intend to abide by the terms of this agreement.

4.20     Defendants told Ms. Gonzalez that if she started work the following day, a Monday, she

needed to stay at Defendants' house that night.

4.21     Ms. Gonzalez traveled to her residence to collect clothes for the week and then returned

to the Shady Grove Metro station, where she was picked up by Brittany Caron and driven to

Defendants' house.

4.22     That evening, Defendants explained in greater detail the work Ms. Gonzalez would

perform, and the following day Ms. Gonzalez began her work as a housekeeper.

4.23     Ms. Gonzalez worked for Defendants from September 21, 2009 through January 31,

2010.

4.24     During that time, she had approximately two days off.

4.25     Ms. Gonzalez worked over forty hours in each work week during that time.

4.26     Ms. Gonzalez's work consisted of cleaning the house and home-office, doing the laundry,

washing the dishes, cooking, caring for Defendants' pets, waiting on Defendants, and performing

other odd jobs.

4.27     Defendants paid Ms. Gonzalez nothing for her work.

4.28     On or about the first Friday that Ms. Gonzalez worked for Defendants, September 25,

2009, Defendant Belinda Caron told Ms. Gonzalez that she should stay with them that weekend

so that they could get acquainted and so that they could take Ms. Gonzalez horseback riding.

4.29     Ms. Gonzalez relied on these statements and agreed to stay that weekend so that she

could see the horses.

4.30     On that Saturday, the Caron family went out and left Ms. Gonzalez at the house to work

and on that Sunday Defendant Belinda Caron worked away from the house much of the day and

left Ms. Gonzalez to work at the house.

4.31    Ms. Gonzalez's first pay day was to be October 2, 2009.

4.32    At approximately noon on October 2, 2009, Defendant Belinda Caron told Ms. Gonzalez that she did not have money to pay her then, but she would pay her the following Wednesday.

4.33    Ms. Gonzalez relied on this statement in continuing to perform work for Defendants and in deciding to stay at Defendants' home.

4.34    Ms. Gonzalez's October rent for her residence in Washington, D.C. was due, but due to non-payment of her wages earned, she could not pay the rent.

4.35    Ms. Gonzalez called her landlord and asked if she could pay him the rent the following Friday and he agreed.

4.36    At approximately noon the following Wednesday, October 7, 2009, Defendant Belinda Caron told Ms. Gonzalez that she would not be able to pay her for another two weeks.

4.37    Ms. Gonzalez relied on this statement in continuing to perform work for Defendants and in deciding to stay at Defendants' home.

4.38    Ms. Gonzalez again called her landlord and asked if she could pay the October and November rent at the end of October.  The landlord agreed.

4.39    By the following Friday, Ms. Gonzalez had only approximately $2.00 and was worried about being able to afford to get home on Friday and back to Shady Grove on the Metro on Sunday.

4.40    At the end of October or beginning of November, Defendant Belinda Caron told Ms. Gonzalez that it would be another two weeks before she could pay Ms. Gonzalez.

4.41    Although Ms. Gonzalez began to think Defendants had no intention of paying her, Ms. Gonzalez had no money and no way to pay for her apartment with rent now overdue and felt that she had no choice but to rely on this statement in continuing to perform work for Defendants.

4.42    In or about the first week of November, Ms. Gonzalez told Brittany Caron to tell Defendant Belinda Caron that Ms. Gonzalez needed to be paid because she would lose her residence in Washington, D.C. if she did not pay the rent.  Brittany Caron did so.

4.43    Brittany Caron then told Ms. Gonzalez that her mother said that she did not want to talk about it.

4.44    Immediately thereafter, Defendant Belinda Caron told Ms. Gonzalez that she would pay her the following Monday.

4.45    Ms. Gonzalez relied on these statements in continuing to perform work for Defendants.

4.46    Each time Defendants made a promise to pay Ms. Gonzalez, they did so with no intention of making such payment, with the intent to deceive Ms. Gonzalez, and with the intent to keep her working for them.

4.47    Each time Defendants made the promise to pay her, Ms. Gonzalez relied on the promise and continued working at the house as a result.  Initially she did so expecting that she would be paid what she earned.  Later, she relied on the promise with the hope that she would be paid at least enough to get back to Washington, D.C., pay her rent, and save her residence.  Finally, she relied on the promise with the hope that she would be paid at least enough to safely return to Washington, D.C.

4.48    Defendants restricted Ms. Gonzalez's access to the telephone and to computers.

4.49    Ms. Gonzalez asked Defendants to take her to the Metro station and Defendants refused to take her.

4.50    Ms. Gonzalez witnessed Defendants refusing to pay other Latino workers who performed odd jobs for Defendants.

4.51    On one occasion in or about late December, when some of these workers asked to be paid, Defendant James Caron yelled at the workers and threatened them with being arrested. Brittany Caron then told Ms. Gonzalez that the police were outside and her father claimed that the workers had been doing drugs.

4.52    On or about December 12, 2009, Ms. Gonzalez again asked Defendant Belinda Caron to pay her.  Ms. Gonzalez stated that she wanted to go back to Washington, D.C.  Defendant Belinda Caron refused to take Ms. Gonzalez to the Metro station and stated that she could not pay Ms. Gonzalez.

4.53    Defendant Belinda Caron told Ms. Gonzalez that if there was a problem her husband would call the police and that the police arrest whomever he wants because he was a Captain with the fire department and he knew them.

4.54    Defendant Belinda Caron then told Ms. Gonzalez that she could not leave at that time because there would be nobody to take care of the children.  Defendant Belinda Caron told Ms. Gonzalez that things would be better in April because Defendant Belinda Caron's father was going to give the family a large sum of money.

4.55    Later that evening, Defendant Belinda Caron said she could not pay Ms. Gonzalez because it was a Saturday.

4.56    In or about January of 2010, Ms. Gonzalez saw a human trafficking hotline advertised on television.  Once she was able to gain access to a telephone she called the number and was eventually put in touch with an employee of CASA of Maryland.  CASA of Maryland arranged for a group to go to Defendants' house and to take Ms. Gonzalez from the house.

4.57    While Ms. Gonzalez worked for Defendants, Ms. Gonzalez lost her residence in Washington, D.C.   All of her personal property, other than the week's worth of clothes she had

packed and brought with her in September, were put in storage by her landlord who then left the country.

### b. Facts Relevant to Plaintiff Lisa Wilkinson

4.58    In or around March 2008, Ms. Wilkinson placed an advertisement on Craigslist offering her services as a housekeeper.

4.59    In or about the end of March 2008, Defendant Belinda Caron contacted Ms. Wilkinson and asked her to clean her house.  Ms. Wilkinson agreed and for two days she commuted from Bethesda to Dickerson and cleaned the Caron house.

4.60    Within a few days after this, Defendant Belinda Caron called Ms. Wilkinson and offered her a job as a Monday to Friday live-in housekeeper for $350.00 per week to be paid every Friday.

4.61    Defendant Belinda Caron also promised to transport Ms. Wilkinson to and from the Caron house at the beginning and end of each work week.

4.62    Defendant Belinda Caron also promised to take Ms. Wilkinson to the Eastern Shore of Maryland where Caron would help Ms. Wilkinson get her driver's license back and would pay Ms. Wilkinson's fines resulting from old traffic citations.

4.63    Defendant Belinda Caron made these promises with no intention of keeping them and with the intent to secure and maintain Ms. Wilkinson's employment.

4.64    Within a few days after this conversation, Ms. Wilkinson accepted the job offer.

4.65    Defendants offered and Ms. Wilkinson accepted the employment on the terms outlined above.

4.66    Defendants and Ms. Wilkinson entered into a contract on those terms.

4.67    Ms. Wilkinson was at all times ready to comply with the terms of the contract and did in fact comply with the terms.

4.68    Ms. Wilkinson relied on the statements of Defendant Belinda Caron, as outlined above, in accepting the job and in performing work for Defendants.

4.69    Defendants did not intend to abide by the terms of this agreement.

4.70    On or about April 1, 2008, Defendant Belinda Caron picked up Ms. Wilkinson at her residence in Bethesda and drove her to the Caron home in Dickerson.  Ms. Wilkinson brought with her a week's worth of clothing.

4.71    On most days Ms. Wilkinson worked from approximately 6:00 a.m. to approximately 8:00 p.m., though sometimes she worked until as late as 11:00 p.m.

4.72    On the first Friday that Ms. Wilkinson worked she asked Defendant Belinda Caron for her pay and Caron told her that she did not have the money, but that she would pay her soon.

4.73    Over the next several weeks, Ms. Wilkinson repeatedly asked Defendant Belinda Caron to be paid and each time Caron would make an excuse about why Caron could not pay.

4.74    On or about Friday, April 27, 2008, Defendant Belinda Caron drove Ms. Wilkinson to Wilkinson's Bethesda residence to drop her for the weekend.  Ms. Wilkinson again asked to be paid.  Caron gave Ms. Wilkinson $100.00.

4.75    The following Sunday, Defendant Belinda Caron failed to pick up Ms. Wilkinson.

4.76    In or around early June 2008, Defendant Belinda Caron called Ms. Wilkinson and told her that if she came back to work, Caron could pay her $350.00 per week and would allow her to live in a house that Caron had been trying to sell.

4.77    Defendant Belinda Caron told Ms. Wilkinson that she would use the money she owed Wilkinson to cover the first month's rent and the security deposit on the house.

4.78    Ms. Wilkinson agreed to continue working for the Carons.

4.79    In early June, Defendant Belinda Caron picked up Ms. Wilkinson at her residence in Bethesda and drove her to the Caron home in Dickerson.

4.80    Defendant Belinda Caron told Ms. Wilkinson that she could not yet move into the other house, so Ms. Wilkinson continued to live in the Caron house.

4.81    On or about June 14, 2008, Ms. Wilkinson was allowed to move into the other house, which is located at 20500 Beallsville Road in Dickerson.  The house is approximately two and a half miles from the Caron house.

4.82    Defendant Belinda Caron gave Ms. Wilkinson curtains and a laptop computer as gifts.

4.83    Defendants picked up Ms. Wilkinson each morning and drove her to the Caron house to work and then dropped Ms. Wilkinson off at 20500 Beallsville Road each night.

4.84    Thereafter, Defendants occasionally paid Ms. Wilkinson some of her pay in cash.

4.85    Most of Ms. Wilkinson's earnings were kept by Defendants and allegedly credited towards rent, electricity and telephone charges.

4.86    Defendants overcharged Ms. Wilkinson for electricity.

4.87    On the morning of Monday, October 27, 2008, Defendants did not pick up Ms. Wilkinson from the house at 20500 Beallsville Road.  Ms. Wilkinson spoke to Defendant Belinda Caron on the phone and Caron said she would pick up Ms. Wilkinson later in the day.  She did not.

4.88    On Tuesday, October 28, 2008, Ms. Wilkinson called Defendant Belinda Caron and Caron told Ms. Wilkinson that she had to be moved out of the Beallsville Road house on October 31, 2008.

4.89    Ms. Wilkinson then tried to make a phone call to arrange her move and found that her phone, which she obtained through the Carons, had been disconnected.

4.90    Defendant Belinda Caron never helped Ms. Wilkinson get her driver's license back and pay her fines as Caron had promised.

4.91    In November 2008, the Montgomery County police notified Ms. Wilkinson that the Carons accused her of stealing the laptop computer and curtains Defendant Belinda Caron had given her and the cell phone which Ms. Wilkinson had paid for through pay deductions.

4.92    To avoid trouble with the police, Ms. Wilkinson gave these items to the police.

4.93    Defendants did not pay Ms. Wilkinson, in cash or in kind, $350.00 for each week Ms. Wilkinson worked.

4.94    When Ms. Wilkinson was not paid the full $350.00 per week in cash or in kind, Defendant Belinda Caron repeatedly promised to pay the balance owed to Ms. Wilkinson soon.

4.95    Each time Defendant Belinda Caron made a promise to pay Ms. Wilkinson, she did so with no intention of making such payment, with the intent to deceive Ms. Wilkinson, and with the intent to keep her working for the Carons.

4.96    Ms. Wilkinson relied on these promises and promises made concerning her driver's license and fines and continued working for the Carons as a result.

**c.  Facts Relevant to Plaintiff Paula Diaz**

4.97    On October 27, 2008, Defendant Belinda Caron advertised at CASA of Maryland for a housekeeper.

4.98    The advertisement sought a housekeeper for five days per week to clean, do laundry, and cook occasionally.  The advertisement offered $350.00 per week.  It  also offered extra pay for cleaning houses for Defendant Belinda Caron's realty company.

4.99    Soon thereafter, Plaintiff Paula Diaz heard about this job opportunity and spoke with Defendant Belinda Caron.

4.100   In addition to what was promised in the advertisement, Defendant Belinda Caron promised to pick up Ms. Diaz in Germantown at 8 a.m. each morning and to drop her off in Germantown after Ms. Diaz finished working at 5 p.m. each week day.

4.101   Defendants offered and Ms. Diaz accepted the employment on the terms outlined above.

4.102   Defendants and Ms. Diaz entered into a contract on those terms.

4.103   Ms. Diaz was at all times ready to comply with the terms of the contract and did in fact comply with the terms.

4.104   Around the end of October or beginning of November 2008, Ms. Diaz began working for the Carons.

4.105   Ms. Diaz worked Monday through Friday cleaning the Caron house, doing laundry, ironing, taking care of the pets and making dinner.

4.106   On most days Ms. Diaz worked from approximately 8:30 a.m. to approximately 5:00 p.m.

4.107   Ms. Diaz worked until mid-January.

4.108   Ms. Diaz was paid nothing for her last two weeks of work.

4.109   On or about January 10, 2009, Ms. Diaz asked Defendant Belinda Caron for her pay.

4.110   Defendant Belinda Caron told Ms. Diaz that she could not pay her because there was a problem with the bank and that she would pay her on the following Monday.

4.111   On the following Monday, Ms. Diaz asked Defendant Belinda Caron for her pay. Defendant Belinda Caron told Ms. Diaz that she would pay her for two weeks on the following Friday.

4.112   On the following Friday, Ms. Diaz asked Brittany Caron to tell her mother that Ms. Diaz needed to be paid.  Brittany Caron spoke to her mother and then Defendant Belinda Caron told Ms. Diaz that she would deliver Ms. Diaz's pay to Ms. Diaz's residence the following day.

4.113   Ms. Diaz's pay was not delivered the following day.

4.114   Ms. Diaz and her son made several attempts to be paid, including making telephone calls over the following weeks to Defendant Belinda Caron, Defendant James Caron and Brittany Caron.

4.115   Ms. Diaz was never paid anything for her final two weeks of work.

4.116   Each time Defendant Belinda Caron made a promise to pay Ms. Diaz, she did so with no intention of making such payment, with the intent to deceive Ms. Diaz, and with the intent to keep her working for the Carons.

4.117   Ms. Diaz relied on these promises and continued working for the Carons as a result.

**d.   Facts Relevant to Plaintiff Maura Cerrano**

4.118   In early May 2009, Plaintiff Maura Cerrano heard about a job opportunity to be a Monday to Friday live-in housekeeper with the Caron family from a co-worker of Ms. Cerrano's niece.

4.119   Her niece's co-worker told Ms. Cerrano some of the details about the work, including that the job offered $350.00 per week for Monday to Friday and additional money for working on the weekend.

4.120   Ms. Cerrano arranged to meet the Carons at a store in Germantown on or about May 14, 2009.

4.121   On or about May 14, 2009, the Carons picked up Ms. Cerrano in Germantown and drove her to their home in Dickerson.

4.122   During the drive Defendant Belinda Caron confirmed that Ms. Cerrano would be paid $350.00 per week to be paid weekly and that she would earn more if she worked on the weekend.

4.123   Defendant Belinda Caron also told Ms. Cerrano that her job would include cleaning, ironing, doing laundry, taking care of the pets and cooking dinner.

4.124   Defendants offered and Ms. Cerrano accepted the employment on the terms outlined above.

4.125   Defendants and Ms. Cerrano entered into a contract on those terms.

4.126   Ms. Cerrano was at all times ready to comply with the terms of the contract and did in fact comply with the terms.

4.127   Ms. Cerrano relied on the statements of Defendant Belinda Caron, as outlined above, in accepting the job and in performing work for Defendants.

4.128   Defendants did not intend to abide by the terms of this agreement.

4.129   On most days Ms. Cerrano worked from approximately 8:00 a.m. or 9:00 a.m. to approximately 10:00 p.m. or 11:00 p.m.

4.130   Ms. Cerrano worked most weekends for Defendants.

4.131   On the Fridays on which she went home to Washington, D.C. for the weekend, Ms. Cerrano usually stopped working at approximately 4:00 p.m. or 5:00 p.m.

4.132   On or about Friday May 22, 2009, Ms. Cerrano was paid $100.00.

4.133   On that day, Defendant Belinda Caron told Ms. Cerrano that she could not pay her what she was owed because the Carons needed the money for a birthday party.

4.134   Defendant Belinda Caron told Ms. Cerrano that she would pay her what she was owed on the following Tuesday.

4.135   On or about Tuesday May 26, 2009, Defendant Belinda Caron told Ms. Cerrano that she did not have the money to pay her because the party was coming up.  Caron promised to pay Ms. Cerrano on the following Friday.

4.136   Ms. Cerrano was not paid the following Friday.

4.137   Thereafter, Ms. Cerrano repeatedly asked Defendants to pay her.  Each time, except for two occasions, Defendants gave reasons for their inability to pay and promised to pay Ms. Cerrano in the future.

4.138   On two occasions when Ms. Cerrano asked to be paid, Defendant Belinda Caron paid her $300.00.

4.139   On one occasion in or around June 2009, Ms. Cerrano told Defendant James Caron that she had not been paid.

4.140   Defendant James Caron told Ms. Cerrano that he would pay her.

4.141   Defendant James Caron never paid Ms. Cerrano.

4.142   On one occasion, Defendant Belinda Caron offered Ms. Cerrano additional work cleaning another house.  Caron promised her an extra $200.00 for that work.

4.143   Ms. Cerrano performed the additional work, but was not paid for it.

4.144   Each time Defendant Belinda Caron made a promise to pay Ms. Cerrano, she did so with no intention of making such payment, with the intent to deceive Ms. Cerrano, and with the intent to keep her working for the Carons.

4.145   Ms. Cerrano relied on these promises and continued working for the Carons as a result.

   **e.   Facts Relevant to All Plaintiffs**

4.146   Defendants' actions in securing and maintaining Plaintiffs' employment without pay, as described above, were willful, malicious and outrageous.

4.147   Defendants breached their contracts with Plaintiffs by not transporting them as promised at the beginning and end of each work week and/or by not paying Plaintiffs for their work.

4.148   Plaintiffs suffered injury, including but not limited to lost wages, as a result of the breaches of contract.

4.149   Defendants, as employers and/or joint employers, hired and suffered or permitted Plaintiffs to perform the following work, <u>inter alia</u>: cleaning the house and home-office, doing the laundry, washing the dishes, cooking, caring for Defendants' pets, waiting on Defendants, and performing other odd jobs.

4.150   Defendants failed to compensate Plaintiffs at least the federal and state minimum wage per hour worked in each work week as required by the FLSA and the MWHL.

4.151   Defendants failed to compensate Plaintiffs at a rate of one and a half times their regular hourly rate for every hour worked in excess of forty hours a given work week as required by the MWHL.

4.152   Defendants failed to set regular pay periods and timely pay wages to Plaintiffs as required by the MWPCL.

4.153   Defendants failed to pay Plaintiffs all wages due for work performed before the termination of Plaintiffs' employment, as required by the MWPCL.

4.154   Defendants' failures to pay all wages due and owing to Plaintiffs were willful, deliberate and/or in reckless disregard of the rights of Plaintiffs to be paid fully and timely for work performed, including overtime, and not the result of a bona fide dispute.

4.155   Defendant Belinda Caron's acts and omissions alleged herein were done as an agent for Defendant James Caron.

4.156   Defendant James Caron's acts and omissions alleged herein were done as an agent for Defendant Belinda Caron.

4.157   Brittany Caron's acts and omissions alleged herein were done as an agent for Defendants Belinda Caron and James Caron.

**f.   Facts Relevant to Plaintiffs Janet Gonzalez and Maura Cerrano**

4.158   Defendants did not obtain either written employment contracts signed by both Defendants and each Plaintiff or disclosure statements signed by each Plaintiff as required by Montgomery County Code Sec. 11-4B(c).

4.159   Defendants did not provide living accommodations to Plaintiffs that met the standard required by Montgomery County Code Sec. 11-4B(d) in that Plaintiffs' room did not have a door which could be locked.

**g.   Facts Relevant to Lisa Wilkinson and Paula Diaz**

4.160   Defendants failed to compensate Plaintiffs at a rate of one and a half times their regular hourly rate for every hour worked in excess of forty hours a given work week as required by the FLSA during work weeks in which they commuted daily from a residence other than the Defendants' home.

**V.   Causes of Action**

## FIRST CAUSE OF ACTION:

**FAIR LABOR STANDARDS ACT (FLSA): Minimum Wage**

**[All Plaintiffs]**

5.1   Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.2   Defendants violated Plaintiffs' rights under the FLSA by failing to pay them the minimum wage for each hour worked in each discrete work week in violation of the FLSA.  29 U.S.C. § 206(a)(1).

5.3   Defendants' violations of the FLSA were willful within the meaning of 29 U.S.C. § 255.

5.4     Defendants are liable to Plaintiffs for their unpaid minimum wages, plus an additional equal amount as liquidated damages, reasonable attorney's fees and costs, and any other appropriate relief.

## SECOND CAUSE OF ACTION:

## FAIR LABOR STANDARDS ACT (FLSA): Overtime

### [Plaintiffs Lisa Wilkinson and Paula Diaz]

5.5     Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.6     Defendants violated Plaintiffs' rights under the FLSA by failing to pay them their overtime wages for each hour worked in excess of forty in each discrete work week in violation of the FLSA.  29 U.S.C. § 207(a)(1).

5.7     Defendants' violations of the FLSA were willful within the meaning of 29 U.S.C. § 255.

5.8     Defendants are liable to Plaintiffs for their unpaid overtime wages, plus an additional equal amount as liquidated damages, reasonable attorney's fees and costs, and any other appropriate relief.

## THIRD CAUSE OF ACTION:

## MARYLAND WAGE AND HOUR LAW

### [All Plaintiffs]

5.9     Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.10    Defendants failed to pay Plaintiffs' minimum wages in violation of Md. Code Ann., Lab & Empl. § 3-413.

5.11    Defendants failed to pay Plaintiffs' overtime wages in violation of Md. Code Ann., Lab & Empl. § 3-415 and § 3-420.

5.12    Defendants are liable to Plaintiffs pursuant to Sections 3-427(a) and (d) of the MWHL for

their unpaid wages, including any overtime owed, plus interest, reasonable attorney's fees and

costs, and any other appropriate relief.

## FOURTH CAUSE OF ACTION:

## MARYLAND WAGE PAYMENT AND COLLECTION LAW

### [All Plaintiffs]

5.13    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.14    Defendants failed to pay Plaintiffs all wages due, including overtime, on their regular

paydays, in violation of Md. Code Ann., Lab & Empl. § 3-502.

5.15    Defendants failed or refused to pay Plaintiffs all wages due for work that they performed

before the termination of their employment, in violation of Md. Code Ann., Lab & Empl. § 3-

505.

5.16    Defendants' failures to pay all required wages in a timely and regular manner violated the

MWPCL.

5.17    Pursuant to Md. Code Ann., Lab & Empl. § 3-507.1, Plaintiffs seek unpaid wages, treble

damages, interest, reasonable attorney's fees and costs, and any other relief deemed appropriate

by the court.

## FIFTH CAUSE OF ACTION:

## TRAFFICKING VICTIMS PROTECTION ACT (TVPA) – Forced Labor

### [Plaintiff Janet Gonzalez]

5.18    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.19    18 U.S.C. § 1589(a) provides that it is unlawful to "knowingly provide[] or obtain[] the

labor or services of a person by any one of, or by any combination of, the following means—(1)

by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

5.20    The TVPA's Purpose and Findings state explicitly that crimes of involuntary servitude include those perpetrated through psychological abuse and non-violent coercion.

5.21    Defendant subjected Plaintiff Janet Gonzalez to forced labor in violation of 18 U.S.C. § 1589(a).

5.22    Defendants knowingly caused Plaintiff Janet Gonzalez serious harm and threatened Plaintiff Janet Gonzalez with serious harm in order to obtain her labor and services in violation of 18 U.S.C. § 1589(a).

5.23    Defendants threatened Plaintiff Janet Gonzalez with false allegations of criminal conduct and/or arbitrary arrest in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(a).

5.24    Defendants knowingly obtained the labor and services of Plaintiff Janet Gonzalez in violation of 18 U.S.C. § 1589(a) using a scheme, plan, or pattern which, in the totality of the circumstances, was intended to coerce and did coerce Plaintiff Janet Gonzalez to believe that she would suffer serious harm if she did not continue to perform labor or services for them.

5.25    Pursuant to 18 U.S.C. § 1595, Plaintiff Janet Gonzalez is entitled to recover compensatory and punitive damages, reasonable attorney's fees, and costs for Defendants' wrongful conduct.

## SIXTH CAUSE OF ACTION:

### TRAFFICKING VICTIMS PROTECTION ACT (TVPA) – Trafficking

### [Plaintiff Janet Gonzalez]

5.26    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.27    18 U.S.C. § 1590 provides that "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter," including, but not limited to, the laws prohibiting forced labor and peonage, has engaged in unlawful behavior under the TVPA.

5.28    Defendants violated 18 U.S.C. § 1590 by knowingly recruiting, harboring, transporting, providing and/or obtaining Plaintiff Janet Gonzalez for labor or services in violation of the laws prohibiting forced labor and peonage.

5.29    Defendants attempted to and did violate the TVPA prohibition against forced labor set forth in 18 U.S.C. § 1589 as alleged above in paragraphs 5.18 to 5.25.

5.30    Defendants attempted to and did violate 18 U.S.C. § 1581 by holding Plaintiff Janet Gonzalez in a condition of peonage.

5.31    Pursuant to 18 U.S.C. § 1595, Plaintiff Janet Gonzalez is entitled to recover compensatory and punitive damages, reasonable attorney's fees, and costs for Defendants' violations of 18 U.S.C. § 1590.

## SEVENTH CAUSE OF ACTION:

## BREACH OF CONTRACT

## [All Plaintiffs]

5.32    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.33    Defendants entered into employment contracts with Plaintiffs.

5.34    Plaintiffs performed their obligations under the contracts.

5.35    Defendants breached the contracts by failing to comply with the terms and conditions promised, as outlined above.

5.36    As an actual and direct consequence of Defendants' breaches, Plaintiffs suffered damages and economic injury.

5.37    Defendants are liable to Plaintiffs for the damages that arose naturally and according to the usual course of things from Defendants' breaches, as provided by state common law, including unpaid wages, damages arising from the delay, and prejudgment interest.

## EIGHTH CAUSE OF ACTION:

## FRAUDULENT MISREPRESENTATION

## [All Plaintiffs]

5.38    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.39    Defendants made statements to Plaintiffs, as specified above, which they knew to be untrue or for which they had such reckless indifference for their truth that they were equivalent to actual knowledge of their falsity.

5.40    Defendants made these statements with the intent of defrauding Plaintiffs and inducing Plaintiffs to continue working for them and to refrain from leaving their home.

5.41    Plaintiffs had the right to rely on these statements and did in fact rely on them to their

detriment.

5.42    Plaintiffs suffered damages as a direct consequence of Defendants' fraudulent

misrepresentations.

### NINTH CAUSE OF ACTION:

### NEGLIGENT MISREPRESENTATION

### [All Plaintiffs]

5.43    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.44    Defendants owed a duty of care to Plaintiffs as their employers and prospective

employers to refrain from making false statements about the core terms and conditions of

Plaintiffs' employment.

5.45    Defendants negligently asserted to Plaintiffs that they would pay them for their work.

5.46    Defendants intended for Plaintiffs to rely on these statements to begin working for them

and to continue working for them.

5.47    Defendants knew that Plaintiffs would probably rely on these statements.

5.48    Plaintiffs justifiably relied on Defendants' statements and continued to work for

Defendants.

5.49    As a result of these statements, Plaintiffs were harmed and suffered economic and other

damages.

## TENTH CAUSE OF ACTION:

## NEGLIGENCE

## [All Plaintiffs]

5.50    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

5.51    Defendants owed a duty to Plaintiffs to not employ Plaintiffs when they did not have the ability to pay Plaintiffs.

5.52    Defendants breached that duty.

5.53    As a direct result of those breaches, Plaintiffs were harmed and suffered economic and other damages.

## VI. Prayer for Relief

6.1    WHEREFORE, Plaintiffs respectfully pray that this Court grant them the following relief:

a) Enter a declaratory judgment that Defendants Belinda Caron and James Caron violated Plaintiffs' rights under the TVPA, FLSA, MWHL, and MWPCL, breached Plaintiffs' employment contracts with Defendants, and breached their duties under tort law through negligence and by making fraudulent misrepresentations to Plaintiffs and by making negligent misrepresentations to Plaintiffs;

b) Enter a declaratory judgment that Defendants Belinda Caron and James Caron violated Plaintiff Janet Gonzalez's rights under the TVPA;

c) Enter a declaratory judgment that Defendants Belinda Caron and James Caron violated Plaintiff Janet Gonzalez's and Plaintiff Maura Cerrano's rights under the Montgomery County Code;

d) Award Plaintiffs their unpaid minimum wages, plus an equal amount as liquidated damages, for Defendants' violations of the FLSA;

e) Award Plaintiffs Lisa Wilkinson and Paula Diaz their unpaid overtime wages, plus an equal amount as liquidated damages, for Defendants' violations of the FLSA;

f) Award Plaintiffs their unpaid minimum wages and overtime wages for Defendants' violations of the MWHL;

g) Award Plaintiffs their unpaid minimum wages and overtime wages, plus three times that amount as liquidated damages, for Defendants' violations of the MWPCL;

h) Order the Defendants to pay the employers' shares of FICA, FUTA, state unemployment and other employment related taxes;

i) Award Plaintiffs actual, incidental and consequential damages resulting from Defendants' breaches of contract;

j) Award Plaintiffs actual, incidental, consequential, and punitive damages resulting from Defendants' fraudulent misrepresentations;

k) Award Plaintiff Janet Gonzalez compensatory and punitive damages for Defendants' violations of the TVPA;

l) Award Plaintiffs actual, incidental, and consequential damages resulting from Defendants' negligent misrepresentations;

m) Award Plaintiffs actual, incidental, and consequential damages resulting from Defendants' negligence;

n) Enter a declaratory judgment that Defendants obtained Plaintiffs' services by false pretenses, a false representation, or actual fraud;

o) Enter a declaratory judgment that Plaintiffs' claims are excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A);

p) Enter a declaratory judgment that Plaintiffs' claims against Defendants are for willful and malicious injuries caused by Defendants;

q) Enter a declaratory judgment that Plaintiffs' claims are excepted from discharge pursuant to 11 U.S.C. § 523(a)(6);

r) Award Plaintiffs their reasonable attorney's fees, expenses and costs of court;

s) Award Plaintiffs pre-judgment and post-judgment interest as allowed by law;

t) Award Plaintiffs such further relief as is just and proper.

Respectfully submitted,

<u>s/ Nathaniel Norton</u>
Nathaniel Norton, Esq.
Dist. of MD Bar No. 29231
Legal Aid Bureau, Inc.
500 E. Lexington St.
Baltimore, MD 21202
Tel. No. (410) 951-7815
Fax No. (410) 685-6951
Email: nnorton@mdlab.org
Attorney-in-charge for Plaintiffs
Janet Gonzalez and Lisa Wilkinson

Heather L. Gomes, Esq.
Dist. of MD Bar No. 27795
Legal Aid Bureau, Inc.
6811 Kenilworth Ave., Ste. 500
Riverdale, MD 20737
Tel. No. (301) 560-2101
Fax No. (301) 927-4258
Email: hgomes@mdlab.org

Co-counsel for Plaintiffs
Janet Gonzalez and Lisa Wilkinson

s/ Sebastian Amar
Sebastian Amar, Esq.
Dist. of MD Bar No. 29064
CASA of Maryland
734 University Blvd. E.
Silver Spring, MD 20903
Tel. No. (301) 431-4185
Fax No. (301) 431-4179
Email: samar@casamd.org
Attorney-in-charge for Plaintiffs
Maura Cerrano and Paula Diaz


## CERTIFICATE OF SERVICE

I hereby certify that on true and correct copies of this First Amended Complaint will be served upon Defendants, who have not yet been served with summons and the original Complaint and who have not yet filed answers, at the same time they are served with summonses, the original Complaint and Notice of Dismissal [of Brittany Caron].

s/ Nathaniel Norton
Nathaniel Norton